UNITED STATES of America,
Plaintiff,

v.

A. C. REINKING, d/b/a A. C. Reinking
Lumber Co., Defendant.

No. 9899.

United States District Court
W. D. Missouri, W. D.

Sept. 10, 1958.

Edward L. Scheufler, U. S. Atty., Kansas City, Mo., for plaintiff.

Walter R. James, North Kansas City, Mo., for defendant.

DUNCAN, Chief Judge.

Plaintiff, United States of America, brings this action to recover excess profits paid defendant by the plaintiff under a contract entered into by the parties in furtherance of a program on the part of the United States Air Force to develop contractor operated lumber storage plants to store government-owned lumber.

The contract, Contract No. AF 33 (038)–15618, dated 1 November, 1950, (hereinafter called "basic contract"), was styled "Fixed Price Contract For Services" and read as follows:

"1. *Services to be Furnished*

"(a) The Contractor shall furnish and supply to the Government lumber storage services and special lumber millwork services in connection with Government-owned lumber delivered by the Government to the Contractor's plant located at 5201 East 9th Street, Kansas City, * * *.

"(b) The Contractor shall furnish said services when and as the Government may make Calls for hereunder during the period set forth in Clause 3 hereof.

"(c) Calls by the Government hereunder will be made by the Contracting Officer, Headquarters Air Materiel Command, by written notification to the Contractor. Each such Call shall set forth the services to be furnished, the time of performance and the estimated cost. * * * *"

The Contractor was to furnish services provided for in the basic contract commencing 1 November, 1950, and ending 31 December, 1952. Prices for the services to be provided by the defendant were set forth in the basic contract, and payment by the plaintiff to the defendant was to be made upon the submission of properly certified invoices or vouchers for services furnished pursuant to Calls made by the plaintiff. The aggregate price for all the services was not to exceed $1,000,000.

The basic contract further provided, in section 2(b), for the price for services to be called for after 30 June 1951 shall be negotiated by and agreed upon by the parties prior to issuance of Calls by the Government, and shall be evidenced by a Supplemental Agreement to the Contract.

The plaintiff issued Calls under the basic contract and the defendant entered upon performance thereof. Thereafter, the plaintiff, desiring to increase the total aggregate amount for all the services that may be called for, entered into Supplemental Agreement No. 1, September 28, 1951, whereby the aggregate amount was increased from $1,000,000 to $3,000,000.

On November 15, 1951, the plaintiff and the defendant entered into Supplemental Agreement No. 2, wherein, pursuant to Clause 2(b) of the basic contract, there was a price revision for the services to be Called for by the plaintiff. The agreement further provided for a credit to be allowed the Government by the Contractor on invoices submitted during the period 1 July, 1951,

through 31 December, 1951, in the amount of $151,973.54.

There was included in Supplemental Agreement No. 2 Clause 33, entitled *"Price Revision,"* which read, in part, as follows:

"33. *Price Revision*

"(a) Because of the experimental and developmental nature of the work called for by this contract and the great uncertainty as to the cost of performance hereunder, the parties agree that the contract price may be increased or decreased in accordance with the provisions of this Clause.

\*   \*   \*   \*   \*   \*

"In no event shall the revised price exceed the sum of $810,817.22 for the period commencing with the beginning of performance under this contract and ending 31 July 1951 and 10% in excess of the prices established under Clause 2(b) respectively for the two (2) periods 1 August 1951 through 30 June 1952 and 1 July 1952 through 31 December 1952."

The new unit prices thus established in Supplemental Agreement No. 2 were to be effective through 30 June, 1952.

Supplemental Agreement No. 4, dated March 7, 1952, provided for the basic contract to be extended from 31 December, 1952, to 30 June, 1955. There were no Supplemental Agreements Nos. 3, 5 and 6.

The defendant and Contracting Officers, representing the Air Force, commenced negotiations November 3, 1952, for a price redetermination pursuant to Clause 33 of Supplemental Agreement No. 2, for the period from the inception of the basic contract through 30 June, 1952. As a result of these negotiations, a memorandum was prepared and signed by the defendant and Contracting Officers of the Air Force. The memorandum dated 6 November, 1952, reads, in part, as follows:

"1. During the price redetermination proceedings conducted with subject Contractor on the dates 3 November and 4 November 1952 at Headquarters, Air Materiel Command, in accordance with the terms of subject contract, the following was agreed upon:

"(a) That a sum of $764,393.00 is owing the Air Force as a result of excess profits which were determined as having accrued to the Contractor for the period from the inception of the contract through 30 June 1952. This amount is exclusive of an amount of $151,973.54 previously refunded the Air Force. The total of these amounts, $916,-366.54, represents the gross price adjustment of this contract for the period from inception through 30 June 1952. It is further agreed that the Contractor will notify the Air Force within fifteen (15) days from date concerning the precise manner in which he proposes to make this refund.  \*   \*   \*

"(2) A formal definitive instrument covering the agreements noted above will be forwarded to you as soon as possible for execution. This instrument will become a part of subject definitive contract."

The "formal definitive instrument" referred to in the memorandum of 6 November, is Supplemental Agreement No. 7 (hereinafter called Agreement). In accordance with the memorandum of 6 November, an Agreement was prepared by the Air Force and sent to the defendant around December 1, for his signature, with said Agreement specifying a refund of $764,393.

The defendant did not sign the Agreement sent to him. Rather, it was turned over to his attorney, Mr. V. E. Phillips, who returned it to the Air Force with a letter dated 5 December, 1952, in which it was stated:

"  \*   \*   \*   I have made the recommendation to Mr. Reinking that he not sign until we have had the opportunity of a conference. There are provisions in the Supplemental

Agreement evidently not previously discussed."

The conference requested in the letter was held at Dayton, Ohio, on December 17, 1952, attended by the defendant, V. E. Phillips and Joseph L. Smith, all from Kansas City, and representing the defendant's interest. The Air Force was represented by various Officers, including Major P. S. Harrington. As a result of the negotiations at this conference, it was agreed that the amount indicated on the Agreement, viz.: $764,-393, would be reduced by $16,100 leaving the amount of the refund to be $748,-293.

Although there is a conflict in the evidence as to the exact manner in which the agreed reduction was indicated on Agreement instrument, it is clear that the defendant signed the last page of the Agreement, and Mr. Phillips witnessed it, with the intent that the instrument would be rewritten to conform to the agreement made and so indicated on the instrument. The Agreement further provided in "First (c)," on page 2, that:

"(c) Within ten (10) days after date of execution of this Supplemental Agreement, the Contractor agrees to file with the Contracting Officer a statement showing in detail the manner and method by which the Contractor proposes to accomplish the refund and repayment of said Seven Hundred Forty-Eight Thousand Two Hundred Ninety-Three Dollars and No Cents ($748,-293.00) to the Government."

Negotiations on method by which the defendant would pay the refund were held in Kansas City in the latter part of December, between the defendant and J. B. Straley, a Contracting Officer for the Air Force, pursuant to which a letter memorandum was prepared by Straley and signed by the defendant. The memorandum was dated 30 December, 1952, and read as follows:

"The following proposal is made for your consideration in connection with the refund of $748,293.00 due the Air Force under Supplemental Agreement No. 7 to my contract:

"A. Approximately $353,000.00 of this amount will be paid to Internal Revenue as excess income tax for the calendar year 1951. Internal Revenue has assessed me excess taxes on the money due the Air Force for the calendar year 1951, due to the fact that there was not in effect on December 31, 1951, any document indicating that this was a liability to the Air Force. Internal Revenue advised me that they will credit the Air Force with the amount of excess taxes paid by me as quickly as the matter can be finally settled and they receive an indication from the Air Force of the amount of excess profit due as a refund for the calendar year 1951.

"B. I propose to refund the balance of approximately $395,000.00 in the following manner:

"1. A cash payment of $100,000.-00 not later than June 30, 1953. "A

"2. A cash payment of $100,-000.00 not later than December 31, 1953.

"3. The remaining balance of approximately $195,000.00 I propose to repay in eighteen (18) equal monthly payments commencing January, 1954, and continuing through June 30, 1955, the expiration date of my contract.

"I further agree that should the operation of the Lumber Storage Yard result in income that will permit a more rapid liquidation of the remaining $195,000.00 to liquidate this last amount at a more rapid rate than proposed, equal to the total income from the operation during the eighteen month's period beginning January, 1954, and ending June, 1955.

"This proposal will result in the Air Force having credit from the Internal Revenue and cash from me by December 31, 1953, of approxi-

mately $550,000.00 representing in excess of two-thirds of the total amount due. It is my hope that this method of liquidation will be acceptable by you and that final agreement and any necessary arrangements concerning the formalization of this proposal can be worked out in the very near future."

The defendant subsequently executed a promissory note, dated January 1, 1953, to the "United States of America" for the sum of $395,000 payable on or before June 30, 1955. It was indicated on the note that "(This note is executed in connection with Supplemental Agreement No. 7, to Contract AF 33 (038)— 15618)". In connection with the promissory note, the defendant executed two Chattel Mortgages in favor of the United States of America, one covering 800 head of Brahman Cross Steers and Cows, and the other, Lumber Yard Machinery and Equipment.

J. B. Straley, the Contracting Officer, testified that, upon receipt of the promissory note and chattel mortgages, he revised the Agreement to incorporate into it the method of repayment as set forth in defendant's letter of 30 December, 1952. This revision was accomplished by removing the pages that were affected and rewriting and preparing new pages to cover the provisions of defendant's letter. This necessitated a renumbering of the pages. In revising the Agreement, the Contracting Officer removed Clause "First (c)" on page 2, hereinbefore quoted, and inserted the following in its place:

"(b) * * * It is understood that said total credit of Seven Hundred Forty-Eight Thousand Two Hundred Ninety-Three Dollars and No cents ($748,293.00) accrues to the Air Force as a result of contract operations during the following periods:

```
"1 January 1951 through 31 December 1951 ..............$394,496.00
 1 January 1952 through 30 June 1953 ..................$353,797.00
 Total ........................................$748,293.00
```

———◆———

"(c) The said total sum of Seven Hundred Forty-Eight Thousand Two Hundred Ninety-Three Dollars and No Cents ($748,293.00) shall be repaid to the Government in the following manner:

"(1) The sum of Three Hundred Fifty-Three Thousand Two Hundred Ninety-Three Dollars and No Cents ($353,293.00) represents the tax credit allowable pursuant to Section 3806 of the Internal Revenue Code [26 U.S.C.A. § 3806] as a result of the inclusion in the income tax returns filed by the Contractor for the calendar year 1951 of excess profits to be refunded to the Government in accordance with the price revision agreement set forth in this Supplemental Agreement. The Contractor shall furnish or shall cause the Division of Internal

Revenue to furnish to the Contracting Officer a tax credit certificate properly certified by the Division of Internal Revenue showing the appropriate tax credit allowable pursuant to Section 3806 of the Internal Revenue Code, or in the event all or any portion of such taxes are refunded to the Contractor by the Division of Internal Revenue, such refund shall be paid to the Air Force.

"2. The remaining balance of Three Hundred Ninety-Five Thousand Dollars and No Cents ($395,-000.00) shall be repaid to the Government in accordance with the following schedule:

"(a) The sum of One Hundred Thousand Dollars and No Cents ($100,000.00) not later than 30 June 1953.

"(b) The sum of One Hundred Thousand Dollars and No Cents ($100,000.00) not later than 31 December 1953.

"(c) The remaining sum of One Hundred Ninety-Five Thousand Dollars and No Cents ($195,000.00) in 18 monthly installments. The sum of Ten Thousand Eight Hundred Thirty-Three Dollars and Thirty-Three Cents ($10,833.33) each month beginning January 1954 and continuing for 17 months thereafter, and the sum of Ten Thousand Eight Hundred Thirty-Three Dollars and Thirty-Nine Cents ($10,833.39) as the final 18th monthly installment.

"(3) The Contractor shall execute and deliver to the Contracting Officer the following documents as security for the payment of the remaining balance of Three Hundred Ninety-Five Thousand Dollars and No Cents ($395,000.00) referred to in sub-paragraph (2) above:

"(a) A Promissory Note made payable to the United States of America in the sum of Three Hundred Ninety-Five Thousand Dollars and No Cents ($395,000.00) to be paid on or before 30 June 1955 bearing interest thereon at the rate of Four Percent (4%) per annum. Payments made by the Contractor in accordance with the schedule prescribed above shall be credited to the principal on the Promissory Note. The interest shall be payable semi-annually and shall be charged only on the unpaid balance of the principal amount of the Note.

"(b) A Chattel Mortgage in favor of the United States of America on eight hundred (800) head of Steers and Cows owned by the Contractor and located on Contractor's farm two miles east of Nashua, Clay County, Missouri. This Chattel Mortgage shall expressly provide that it is issued as security for the payment of the first One Hundred Thousand Dollars and No Cents ($100,000.00) to be paid on or before 30 June 1953 on the principal of the Promissory Note referred to above.

"(c) A Chattel Mortgage in favor of the United States of America on all Lumber, Machinery and Handling Equipment owned by the Contractor and located on Contractor's premises, 901 Kindelberger Road, Kansas City, Kansas, and on certain Leasehold Improvements on land leased from Kansas City Industrial Land Company located in Fairfax District, Wyandotte County, Kansas. This Chattel Mortgage shall expressly provide that it is issued as security for the payment on or before 30 June 1955 of the total amount of the principal of Three Hundred Ninety-Five Thousand Dollars and No Cents ($395,000.00) on the Promissory Note referred to above."

The remainder of the Agreement was unaltered and the page containing defendant's signature was the original one signed by him at the December 17, 1952, conference. The Agreement, as altered, was then mailed to the defendant on or about May 1, 1953.

The Air Force recorded the Chattel Mortgages, given as security by the defendant for his Promissory Note, on April 28, 1953, and on May 1, 1953, a Notice of Termination terminating the basic contract was delivered to the defendant by representatives of the Air Force. The defendant received the Notice of Termination and the Agreement, returned to him by the Air Force, on the same day.

The Agreement was returned by the defendant to J. B. Straley, Contracting Officer, with a letter that read as follows:

"Dear Sir:
"Your letter of April 27, 1953, indicated that enclosure was a copy of Supplemental Agreement No. 7 executed by me.
"It is returned for these reasons:
"When in Dayton on December 17, 1952, an adjustment was allowed in

the amount of $62,500.00 on subcontractor items, and a further adjustment of $16,100.00 on salaries. The contract was to be adjusted accordingly. You have omitted the 10% profit to which we are entitled on these adjustments, hence the correct amount should be $7,860.00 less than your figure of $748,293.00. Mr. Phillip's letter of December 23, 1952, for me, called attention to this and requested that this be reflected in the final draft.

"It was also understood that my salary was either to be included, or all rights with respect thereto expressly reserved in this agreement. See my attorney's letter of December 23, 1953, written by V. E. Phillips.

"It is noted that the document enclosed contains several pages not in existence at the time of signature of last page on December 17, 1952.

"Since this is not the contract I signed, and since it does not include two things you promised to include, I am returning the contract to you for revision to include the omitted items and to be returned to me for execution.

"Yours very truly,
"/s/ A. C. Reinking"

Straley, the Contracting Officer, again mailed the Agreement to the defendant, accompanied by a letter dated May 7, 1953, and which reads as follows:

"Subject: Contract AF 33 (038)–15618

"Gentlemen:

"Receipt is acknowledged of your letter dated 2 May 1953 pertaining to subject contract.

"Supplemental Agreement No. 7 is again returned to you inasmuch as the terms and provisions ·contained therein, including your acknowledgment by letter dated 30 December 1952 of an indebtedness to the Government in the sum of $748,293.00 and your proposed plan for repaying such indebtedness, had

been previously accepted by the Government and mutually agreed upon between the parties.

"Very truly Yours,
"/s/ J. B. Straley
"J. B. Straley
"Contracting    Officer"

Subsequently, the defendant returned the Agreement to the Air Force.

The plaintiff has filed an Amended Complaint in which it sets forth five separate claims for relief, alleging as to each claim that it has been damaged in the sum of $748,293, costs, and other such relief that this court may deem proper.

The plaintiff's first claim is based on the letter memorandum of November 6, 1952, alleging that it is a binding contract irrespective of the fact that it called for a formal contract to be signed at a later date.

Plaintiff's second claim is based on the Supplemental Agreement No. 7, Government's Exhibit 9, alleging that it was executed by the defendant at the December 17, 1952, conference and that it is now binding on the defendant.

Plaintiff's third claim is based on an oral agreement of the defendant to repay the sum claimed at the December 17, 1952, conference by and between the parties there attending.

Plaintiff's fourth claim is based upon an acknowledgment made by the defendant at the December 17, 1952, conference that he was indebted to the plaintiff for the sum claimed.

The plaintiff's fifth claim is based partially upon the promissory note executed by the defendant, and the remainder upon the acknowledgment of the defendant on December 17, 1952, as well as his letter of December 30, 1952 acknowledging that he was indebted for the total $748,293.

Defendant filed an Amended Counterclaim in four counts on October 11, 1957, the first count of which is for $500,000 for alleged costs in connection with the basic contract. His second count is for a sum in excess of $50,000 for plaintiff's

alleged diverting of lumber from defendant's lumber yard contrary to the basic contract. Defendant's third count is for $101,644.84 for services rendered for the period July 1, 1952 to September 30, 1952, inclusive. Defendant's fourth count is for alleged damages due to the termination of the contract by the plaintiff. Defendant demanded in each of his counts that his "claim for credit be offset against any relief granted plaintiff on its Amended Complaint".

This court, by pretrial order of November 11, 1957, issued pursuant to a conference held on September 30, 1957, and signed as approved by the attorneys of record for the parties to this action, ordered that:

"1. Plaintiff's claims and the defenses thereto shall be tried first and separate from defendant's counter-claims and the defenses thereto."

The defendant, in accordance with Paragraph 12 of the basic contract providing for the administration of Disputes, had, previous to the commencement of this action, perfected his appeal to the Armed Services Board of Contract Appeals. The defendant's claims on appeal were with regard to the termination of the contract and the price revision for the entire contract.

Paragraph 33(d) of Supplemental Agreement No. 2 specifically provided that should there be no agreement upon a revised price, then the disagreement should be disposed of in accordance with the "Dispute" clause of the basic contract.

Defendant's appeal was before the Armed Services Board for a period of a year and a half, when, on July 13, 1956, the Assistant Secretary of the Air Force (Materiel) directed the Board to take no further action in connection with the defendant's appeal, due to the present action then pending before this court. The Board ceased action on defendant's appeal and denied defendant's motion for reconsideration.

This determination of the validity of plaintiff's claims leaves unresolved the defendant's Counterclaims as heretofore set out, and agreed by the parties to be tried separately and subsequently to the plaintiff's claims. Moreover, there remains unsettled defendant's appeal to the Armed Services Board of Contract Appeals, on which the Board ceased action on direction of the Assistant Secretary of Air Force during the pendency of this action.

The parties to the basic contract were in accord that any disputes or questions of fact, which included matters regarding the termination of the contract as well as the price revision of the entire contract, were to be settled administratively pursuant to the provisions of Paragraph 12 of the basic contract.

It seems to me that the appropriate method of resolving the disputes arising out of the contract between the parties would be by the administrative procedure as provided by the parties in Paragraph 12. This would certainly be in keeping with the intent of the parties as evidenced by their agreement, as well as giving effect to that agreement.

However, the plaintiff's claims coming on for determination, they will be considered in the order in which they are presented by the plaintiff's Amended Complaint.

■ A prime requisite for a memorandum, of the nature of the one executed by the defendant on November 6, to constitute a binding contract between the parties prior to the signing of a formal agreement is the intention of the parties that it be so binding. Julius Kayser & Co. v. Textron, Inc., 4 Cir., 228 F.2d 783, 790.

The basic contract in this instance provided in Clause 2 paragraph (b): "The prices for services * * * shall be evidenced by an appropriate Supplemental Agreement to this Contract." Clause 33, "Price Revision" of Supplemental Agreement No. 2 provided in paragraph (c): "The revised price shall be evidenced by a supplemental agreement to this contract." The plaintiff in this action maintains that the disputed excess profit refund was agreed

upon under Clause 33 of the basic contract.

The memorandum in this instance was prepared following the negotiations which were commenced on November 3. It was signed by P. S. Harrington, Major, USAF, Air Force Contracting Officer and the defendant and witnessed. Paragraph 2 of the memorandum provided:

"2. A formal definitive instrument covering the agreements noted above will be forwarded to you as soon as possible for execution. This instrument will become a part of subject definitive contract."

The memorandum indicated agreement by defendant upon various changes to be made in the basic contract as a result of the price redetermination proceedings, as well as other matters, including an excess profit refund to the Air Force Authorities in the amount of $764,393.

The memorandum was thereafter given to an Air Force contract writer who prepared a formal agreement, entitled "Supplemental Agreement No. 7", which agreement was forwarded to the defendant on or about December 1, 1952. Defendant declined to sign the Supplemental Agreement, and returned it to the Air Force Authorities for further revision, which was accomplished at the December 17 meeting.

According to the testimony of Major Harrington, the memorandum was a letter reducing to writing his negotiations with the defendant. It is quite evident that the purpose of the memorandum was to serve as a guide in preparation of the "formal definitive agreement". Further, that this formal agreement was intended to be the final binding agreement between the parties. This manner of modifying the basic contract was in keeping with prior modifications, and as was called for by the provisions of the contract.

The clear intention of the parties was that they would be bound only by the formal execution of a Supplemental Agreement, and therefore, the memorandum cannot be considered as a basis for recovery as sought by the plaintiff in Count I of its Amended Complaint.

Plaintiff's second claim for relief is based on an instrument entitled "Supplemental Agreement No. 7" and introduced into evidence as plaintiff's Exhibit No. 9. This instrument consists of a cover page and seven numbered pages. The cover page sets forth data regarding the contracting parties, the amount of the excess profit refund, and various particulars regarding the contract itself. In the center of the cover page appears the following: "Supplemental Agreement to Fixed Price Contract for Services".

The remaining seven pages set forth in paragraph form the alleged agreement. On the bottom of each page there appears the following statement:

"Page [a numeral] of Supplemental Agreement No. 7 to Contract No. AF 33(038)–15618".

The seventh page, which is the signature page, the numeral "7" is typed over what appears to be an erased numeral "6".

This instrument, plaintiff's Exhibit No. 9, is the revised agreement on which the plaintiff bases its Count Two. According to the testimony of J. B. Straley, a former Air Force Contracting Officer who participated in the negotiations with the defendant, Exhibit No. 9 is a revision of the alleged agreement entered into by the defendant at the December 17 meeting. Straley testified that he made the revision in the following manner:

"I revised it [the alleged December 17 agreement] by removing the pages that would be affected and rewriting or preparing new pages to cover the provisions of the letter of December 30th and inserted the new pages into the supplemental agreement."

The revision also included data regarding the mortgages and notes executed in connection with the December 17 agreement, and an apportionment into certain periods the alleged credit that accrued to the Air Force. It is apparent that the erasing and re-numbering of

140

the signature page, page 7, resulted from the revisions made by Straley.

It will be recalled that Exhibit No. 9, the revised and altered Supplemental Agreement, was forwarded on two separate occasions to the defendant, and, on each occasion returned by him to the Air Force on the grounds that it was not the instrument he signed at the December 17 meeting.

■ The extraordinary act of the Air Force Contractors of removing pages from a signed agreement, inserting new ones and then attaching the altered signature page, cannot be recognized as resulting in a legally binding contract. It is the contention of the plaintiff that the changes made by Straley in the alleged agreement entered into by the defendant at the December 17 meeting, were those contemplated by the parties and authorized by the defendant in submission of the December 30 letter embodying his proposed method of repayment, and the execution of the securities.

■■ Generally, an alteration of an instrument is material when it destroys the identity of the instrument, or results in different legal obligations than those originally binding upon the parties to the instrument. 2 Am.Jur.Alteration of Instruments, § 7, page 599. A material alteration vitiates the instrument, unless it was done by express or implied consent. "An implication of consent arising from the circumstances must, however, in order to be binding, be plain and unambiguous." Supra, § 22, page 613.

Defendant contends that there was never any agreement of parties on a Supplemental Agreement No. 7, and that negotions toward eventual agreement were still to be conducted, as evidenced by his repayment proposal in the December 30 letter.

For the purposes of determining the validity of Exhibit No. 9, it may be assumed that the parties had reached a final agreement at the December 17 meeting, and that an instrument, Supplemental Agreement No. 7, was signed as a binding contract between the parties.

There was introduced, Plaintiff's Exhibit No. 5, an instrument which was stated to be a copy of the December 17 agreement, signed by the defendant. The original was not introduced, and it is obvious that the original agreement of December 17 does not exist as such, rather those pages, which were not altered by Straley are now a part of the altered agreement on which the plaintiff bases its Count Two.

The method of payment which was incorporated into the instrument introduced as Exhibit No. 9, was a material alteration which affected the legal obligations of the defendant. It is clear from the facts of this case that the defendant never expressly authorized an alteration of the instrument alleged to be the agreement signed by the defendant at the December 17, meeting. There remains the question of whether or not defendant impliedly consented to the said alterations.

The December 30 letter, in which defendant's method of repayment was proposed, concluded with the following statement:

"It is my hope that this method of liquidation will be acceptable by you and that final agreement and any necessary arrangements concerning the formalization of this proposal can be worked out in the very near future."

Obviously, the defendant intended that his offer be accepted by the Air Force Authorities in some formal manner such as a supplemental agreement to the basic contract, which would be in keeping with prior changes in performance of the basic contract. It is clear that the circumstances in this instance do not manifest a plain and unambiguous consent on the part of the defendant to the alterations and substitutions of the alleged December 17 agreement.

Moreover, it is quite clear from the facts of this case that the defendant intended to make repayment of the excess profits from anticipated earnings through a continuation of the basic contract. Clause 2 of Supplemental Agree-

ment No. 2 provided that the period for making Calls under the basic contract was to extend to and include June 30, 1955. Defendant in his letter proposing his method of repayment had agreed that if the income from the operation of the Lumber Storage Yard permitted, he would liquidate that part of the refund, to be paid in installments more rapidly. This particular offer of the defendant in the letter was not incorporated into the revision of the agreement altered by the Air Force Contracting Officer, Straley.

The basic contract, being of a Call nature, did not obligate the Air Force beyond the actual Calls for services made to the defendant. However, the defendant had leased extensive facilities in preparation for future Calls, and throughout the negotiations regarding a refund had indicated his reliance upon the future Calls as a method of repayment of the excess profits. The Air Force Authorities were aware of this during their negotiations with the defendant.

Nevertheless, the Air Force Authorities, without informing the defendant, intended, throughout the negotiations with the defendant, to terminate the basic contract at the earliest possible moment that would not jeopardize their realizing the greatest possible refund from the defendant.

In a letter from General Bain, the Director of Procurement AMC, on April 21, 1953, to General Tunner, Deputy Commander AMC, shortly before the altered agreement and a notice of termination of the basic contract was sent to the defendant, it was stated in paragraph 5b:

"b. Immediate terminations might conceivably result in reopening the matter of the amount of indebtednesses as well as impairing consummation of negotiations for obtaining the desired securities."

This communiqué and others, introduced in evidence clearly reveal that the Air Force sought to recoup as large a sum as possible from the defendant, without informing him of the impending termination and utilizing his reliance on future Calls as gaining a greater recovery of excess profits paid than otherwise might be gained.

It was further shown that approval of various invoices for payment of services performed by the defendant was withheld until the defendant signed the agreement at the December 17 meeting. Another invoice was approved following the defendant's signing of the December 30 letter, and three more invoices were approved following the defendant's signing of the promissory note.

The manner in which the Air Force Contracting Officers attempted to gain advantage of the defendant is grossly inequitable and bespeaks of fraud which cannot be countenanced.

Plaintiff's Third Claim is based upon alleged oral agreement on the part of the defendant at the December 17 meeting to repay the sum claimed.

Plaintiff's Fourth Claim is based upon an alleged acknowledgment of the indebtedness at the same meeting. The plaintiff having alleged that Supplemental Agreement No. 7 is the written agreement executed by the defendant at the December 17 meeting, it is precluded from asserting recovery on the grounds alleged in Counts Three and Four, where it was obviously the intent of the parties that their binding obligation would be the written contract.

Plaintiff's Fifth Claim is based upon the promissory note executed in connection with the Supplemental Agreement No. 7, and an alleged acknowledgment on the part of the defendant in the December 30 letter of the sum now claimed by the plaintiff.

As to the promissory note, it was given as security in connection with Supplemental Agreement No. 7, and, in view of the vitiation of that agreement, the note must be considered a nullity.

As to the alleged acknowledgment, it has been shown that the letter was merely a proposal on the defendant's part for a plan of repayment, and as such, was an integral part of the ne-

gotiations toward settlement of the alleged claim for excess profits on the part of the Air Force Contracting Officers. This alleged acknowledgment can hardly form a basis of recovery for a debt on which there is no agreement, and which is not otherwise shown as owing.

Therefore, in view of the aforesaid, it is my conclusion that the plaintiff is not entitled to recover, and its claims are dismissed.

Form of judgment entry in accordance herewith, may be submitted within ten days.